| STATE OF LOUISIANA | * | NO. 2024-KA-0160 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| KEVIN ROBERT STERLING | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |
| * * * * * * * | | |

CONSOLIDATED WITH:                    CONSOLIDATED WITH:

STATE OF LOUISIANA                    NO. 2024-KA-0161

VERSUS

KEVIN ROBERT STERLING

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 22-0786, DIVISION "B"
Honorable Michael D. Clement,
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Rosemary Ledet, Judge Rachael D. Johnson)

Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

COUNSEL FOR DEFENDANT/APPELLANT

Charles Ballay, DISTRICT ATTORNEY, Plaquemines Parish
Jason Napoli, ASSISTANT DISTRICT ATTORNEY
333 F. Edward Hebert Boulevard, Building 201
Belle Chasse, LA 70037

COUNSEL FOR STATE OF LOUISIANA/APPELLEE

**CONVICTIONS AFFIRMED; HABITUAL OFFENDER
ADJUDICATION REVERSED; SENTENCES VACATED; AND
REMANDED
July 17, 2024**

*RML*

*DLD*

*RDJ*

This is a criminal case. Following a two-day trial, the jury convicted the defendant—Kevin Sterling ("Mr. Sterling")—of the following five offenses: (i) possession of a firearm by a convicted felon (Count 2); (ii) illegal possession of a firearm (Count 3); (iii) possession of methamphetamine with intent to distribute (Count 4); (iv) possession of marijuana with intent to distribute (Count 5); and (v) possession of fentanyl with intent to distribute (Count 7).[1] The district court sentenced Mr. Sterling three times—once on the original conviction; twice on habitual offender adjudications. For the reasons that follow, we affirm Mr. Sterling's convictions, reverse his habitual offender adjudication, vacate his sentences, and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a traffic stop for a license plate violation. The traffic stop occurred in the wee morning hours of January 24, 2022. At that time,

---

[1] Count 1 was a misdemeanor traffic office—operating a vehicle with an expired license plate—that was not tried before the jury. Count 6, as set forth in the August 2022 amended bill of information, was possession with intent to distribute less than 28 grams of a Schedule II Controlled Dangerous Substance: amphetamine. Before trial, the State dismissed Count 6.

Sergeants Joseph Francis, Jr. ("Sgt. Francis") and Christopher Lambert ("Sgt. Lambert") (collectively the "Officers")—both Plaquemines Parish narcotics officers—were on patrol. Sgt. Francis was the driver of the patrol car; Sgt. Lambert and Sgt. Francis' K-9 dog were passengers.[2] The Officers spotted a silver Mercedes (the "Vehicle") with an obliterated license plate enter the Parish.[3] Based on the traffic violation, the Officers initiated a stop of the Vehicle.

The traffic stop took place in a well-lit, grocery store parking lot. Sgt. Francis approached the driver's side of the Vehicle, where Mr. Sterling was sitting; contemporaneously, Sgt. Lambert approached the passenger's side, where Courtney MacAulay ("Ms. MacAulay") was sitting. When Sgt. Francis started to speak with Mr. Sterling, Sgt. Francis immediately smelled marijuana emanating from the Vehicle. Sgt. Francis asked Mr. Sterling about the marijuana odor. Mr. Sterling replied that "[he] smoked earlier" and that "[t]here's nothing in the [V]ehicle." Meanwhile, Sgt. Lambert started to speak with the passenger, Ms. MacAulay. Sgt. Lambert observed drug-related paraphernalia—a methamphetamine-smoking pipe and a glass-smoking pipe usually used for marijuana, as well as a grinder in the center console. The Officers ordered both occupants to exit the Vehicle.

---

[2] The patrol car had a dash camera, but it was broken. At that time, the Parish's police officers did not have body cameras.

[3] According to Sgt. Lambert, the Vehicle had an "utterly unreadable" license plate. After stopping the Vehicle, the Officers discovered that the license plate was an obliterated Nevada temporary tag that was expired since 2006 or 2008.

Once the occupants exited the Vehicle, Sgt. Francis advised them of their *Miranda* rights;[4] and the Officers searched the vehicle. In the front part of the Vehicle, the Officers found the drug paraphernalia that Sgt. Lambert had observed and a loaded handgun in the glove compartment. In the back seat of the Vehicle, the Officers found a black bag (the "Bag") and additional gun magazines.[5] The Bag had both a locked and an unlocked compartment. In the unlocked compartment, the Officers found a clear plastic bag containing crystal methamphetamine ("crystal meth"). Sgt. Francis asked the occupants who owned the Bag. Although Mr. Sterling claimed ownership of the Bag, he denied knowing the code combination for the Bag's locked compartment.

Given Mr. Sterling's responses regarding the Bag, Sgt. Francis retrieved his K-9 dog from the patrol car and conducted an open-air sniff around both the Vehicle and the Bag. The K-9 dog positively alerted to both the Vehicle and the Bag, indicating that additional narcotics were present. Sgt. Francis then cut open the Bag's locked compartment. Within the locked compartment, Sgt. Francis found the following: (i) additional crystal meth—about 26 grams; (ii) marijuana—about 90 grams; (iii) a prescription drug bottle in Mr. Sterling's name;[6] and (iv) 300 white pills labeled Percocet in a Ziploc bag. The 300 white pills were further divided into three separate baggies, each containing 100 white pills.

The Officers arrested Mr. Sterling and Ms. MacAulay and took them to the Belle Chasse Lockup. There, Mr. Sterling completed a written certificate of

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] Sgt. Lambert testified that the additional gun magazines were in the Bag; Officer Francis testified that they were on the back seat.

[6] A search of the Ms. MacAulay's purse uncovered several prescription pills in her name.

*Miranda* warning and waiver; and he prepared a written statement. In his written statement, Mr. Sterling acknowledged that all the contents of the Vehicle belonged to him—the Bag, the drugs, and the gun. He claimed the drugs were for his personal use because he had a drug habit.[7] He admitted ownership of the gun, claiming that he possessed it for protection because he was almost killed in a robbery the prior month. Finally, he described the location of the seized items: pipe—floorboard; marijuana vape pen—car; gun—glove compartment; crystal meth—locked bag; marijuana—locked bag; and Percocet—locked bag.

Sgt. Francis ran a criminal history background check and confirmed Mr. Sterling's status as a convicted felon; Mr. Sterling had a prior conviction less than a year before this incident for possession of methamphetamine. In February 2022, the seized items were sent to the Jefferson Parish Crime Lab (the "Crime Lab") to be tested. In its May 2022 report, the Crime Lab indicated that the 300 white pills were not Percocet, but fentanyl (90% fentanyl content).

Before receiving the Crime Lab's report, in March 2022, the State filed a bill of information charging Mr. Sterling with six offenses (counts), including possession of oxycodone (*i.e.*, Percocet) with intent to distribute.[8] In April 2022,

---

[7] He stated that he had been attempting to seek treatment, but none was available in the rural area of Louisiana where he lived.

[8] In March 2022, the State filed a bill of information charging Mr. Sterling with the following six offenses:

- Count 1—Operating a vehicle with an expired license plate, in violation of La. R.S. 47:508;

- Count 2—Possession of a firearm or carrying a concealed weapon by a convicted felon, in violation of La. R.S. 14:95.1;

- Count 3—Possession of a firearm while committing a crime of violence or while unlawfully in possession of a controlled dangerous substance, in violation of La. R.S. 14:95(E);

4

Mr. Sterling pled not guilty to all the charges. As noted, the following month, in May 2022, the Crime Lab issued its report indicating that the pills were fentanyl. Three months later, in August 2022, the State filed an amended bill of information, deleting the Percocet charge and adding the fentanyl charge—possession of fentanyl with intent to distribute (Count 7).[9]

In January 2023, a two-day jury trial was held on the five remaining felony counts—Counts 2, 3, 4, 5, and 7.[10] At trial, the State called two witnesses—Sgt. Francis and Sgt. Lambert; their testimony was consistent with the above factual summary. The State also introduced various exhibits, including the seized items, the Crime Lab report[11] and an audio recording of Mr. Sterling's jail calls. The jail calls were placed shortly after his arrest (the "Jail Calls"). Mr. Sterling rested on the presumption of innocence, presenting no evidence.

During deliberations, the jury asked the district court two questions: (i) clarification of the definition of possession and constructive possession; and (ii) whether possession of a substance, while thinking it is a different substance is

---

- Count 4—Possession with the intent to distribute less than 28 grams of methamphetamine, in violation of La. R.S. 40:967(A)(1), (B)(1)(a);

- Count 5—Possession with the intent to distribute less than 2 ½ pounds of marijuana, in violation of La. R.S. 40:966 (A)(1), (B)(2)(a); and

- Count 6—Possession with the intent to distribute less than 28 grams of Oxycodone, in violation of La. R.S. 40:967(A)(1), (B)(1)(a).

[9] Based on the Crime Lab report, the State, in August 2022, filed an amended bill of information charging Mr. Sterling with the same violations in Counts 1 through 5, but amending Count 6 to possession with intent to distribute less than 28 grams of amphetamine, in violation of La. R.S. 40:967(A)(1), (B)(1)(a), and adding Count 7—Possession with intent to distribute Fentanyl, in violation of La. R.S. 40:967(A)(1), (B)(4).

[10] As noted at the outset of this opinion, Count 1 was a misdemeanor traffic offense; Count 6 was dismissed by the State before trial.

[11] The State gave timely notice of its intent to use a certified laboratory report under La. R.S. 15:499.

still possession or constructive possession.[12] In response, the district court provided supplemental jury instructions; defense counsel objected to those instructions.

Thereafter, the twelve-person jury unanimously found Mr. Sterling guilty as charged on all five counts. Based on the original verdict, the district court, in August 2023, sentenced Mr. Sterling to 10 years on Counts 2, 3, and 4; 5 years on Count 5; and 15 years on Count 7, to be served concurrently. Meanwhile, in March 2023, the State filed an habitual (multiple) offender bill alleging that Mr. Sterling was a fourth-felony offender. The multiple bill was filed as to all counts except Count 2—the felon in possession of a firearm count.

In September 2023, the first multiple bill hearing ("First Multiple Bill Hearing") was held. Although the State had charged Mr. Sterling as a fourth-felony offender, the State, due to the unavailability of a witness, only presented evidence regarding two prior felony convictions. Based on the evidence presented, the district court adjudicated Mr. Sterling a third-felony offender. Based on that adjudication, the district court vacated all the initial sentences—including the sentence on Count 2 (the felon in possession of a firearm count)—and resentenced Mr. Sterling to 15 years on Counts 2 to 5; and 20 years on Count 7, to be served concurrently. The State then filed a second multiple bill, again seeking to have Mr. Sterling adjudicated a fourth-felony offender.

In February 2024, the second multiple offender hearing ("Second Multiple Bill Hearing") was held. At that hearing, the district court took judicial notice of its earlier finding that Mr. Sterling was a third-felony offender and, based on the hearing testimony and evidence, adjudicated him to be a fourth-felony offender,

---

[12] The district court's supplemental jury instructions, given in response to the jury's two questions, are set forth elsewhere in this opinion.

6

vacated all the sentences, and resentenced Mr. Sterling to 20 years on Counts 3, 4, and 5; and 40 years on Count 7, to be served concurrently. No sentence was imposed on Count 2. This appeal followed.[13]

## ERRORS PATENT REVIEW

We reviewed the record for errors patent pursuant to La. C.Cr.P. art. 920.[14] None was discerned.

## DISCUSSION

On appeal, Mr. Sterling assigns the following three counseled errors:

- The State failed to prove beyond a reasonable doubt that Kevin Sterling knowingly possessed or had the specific intent to possess fentanyl. The State also failed to lay a proper foundation and prove an uninterrupted chain of custody for the seized evidence, the jail phone calls, or the slang terms. The State also impermissibly relied on hearsay.

- The State failed to prove beyond a reasonable doubt that Kevin Sterling was a fourth felony offender, in a proceeding where the State was procedurally and collaterally estopped from pursuing. Further, the sentence for Count 2 was enhanced and then vacated, both in error.

- The district court erred in imposing constitutionally excessive, maximum sentences.

Mr. Sterling, in his *Pro Se* supplemental brief, assigns one additional error: that he was stopped illegally, that the Vehicle was searched illegally, and that the unconstitutionally seized evidence from this warrantless search should not have been used in the resulting prosecution.

---

[13] On Mr. Sterling's motion, this Court consolidated the appeal of his convictions, No. 2024-KA-0160, with the appeal of his multiple offender adjudication, No. 2024-KA-0161.

[14] La. C. Cr. P. art. 920 provides: "[t]he following matters and no others shall be considered on appeal: (1) An error designated in the assignments of error; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

To analyze the issues presented, we divide our discussion into four sections: (i) sufficiency of evidence of intent to distribute fentanyl; (ii) habitual offender adjudication; (iii) excessive sentence; and (iv) warrantless search.

**Sufficiency of Evidence of Intent to Distribute Fentanyl**

We first address Mr. Sterling's sufficiency of the evidence argument. *See State v. Hearold*, 603 So.2d 731, 734 (La.1992) ("observing that "[w]hen issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence"). Generally, when assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784. 61 L.Ed.2d 560 (1979).

A sufficiency of evidence review must include the whole record, as a rational fact finder does. *State v. Gibson*, 15-0682, p. 12 (La. App. 4 Cir. 1/27/16), 186 So.3d 772, 780. An appellate court's function is not to assess the witnesses' credibility or to reweigh the evidence. *State v. Barbain*, 15-0404, p. 8 (La. App. 4 Cir. 11/4/15) 179 So.3d 770, 76-77 (citation omitted). "[C]onflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency." *State v. Rainey*, 15-0892, p. 9 (La. App. 4 Cir. 1/27/16), 189 So.3d 439, 444 (citation omitted).

Mr. Sterling's sufficiency of the evidence argument centers on his conviction for possession with intent to distribute fentanyl (Count 7). To support a conviction for possession with intent to distribute a controlled dangerous

substance, the State is required to prove two elements: (i) a knowing and intentional possession of the controlled substance—the possession element; and (ii) a specific intent to distribute the substance—the intent to distribute element. *See State v. Taylor*, 16-1124, 16-1183, p. 16 (La. 12/1/16), 217 So.3d 283, 295. Mr. Sterling's argument focuses on the possession element.

Mr. Sterling emphasizes that the possession element includes a guilty knowledge requirement. *State v. Smith*, 257 La. 896, 898, 244 So.2d 824, 825 (1971) (internal citations omitted) (observing that "guilty knowledge is an essential ingredient of the crime of possession of narcotic drugs, i.e., the knowing and intentional possession of a drug subjecting the possessor to criminal liability"). "Thus, the [S]tate must not only prove that the accused possessed the substance identified as a narcotic drug; it must also prove by direct or circumstantial evidence that the accused knew the substance he possessed was a narcotic drug." *Id.*

Mr. Sterling argues that the State was required to prove that he knowingly and intentionally possessed fentanyl, as opposed to Percocet. He contends that he could not have known the 300 pills were fentanyl given the following factors: (i) his written statement admitting that he was in possession of Percocet; (ii) the marking on the pills read Percocet; and (iii) the manner the Officers used to handle the pills. Mr. Sterling further contends that the jury questioned the lack of evidence as to his intent to possess fentanyl and was misdirected by the district court's supplemental jury instructions, which focused on constructive possession rather than knowing and intentional possession. He contends that the State failed to introduce any evidence establishing his guilty knowledge of the content of the pills or that he knew what the pills were. According to Mr. Sterling, the evidence, at

9

best, showed that he intended to possess Percocet and invited the jury to speculate that possession of any substance could be substituted for fentanyl.

We first address Mr. Sterling's contention that the trial court's supplemental jury instruction was misleading. During deliberations, the jury asked two questions, the second of which was "[i]s possession of a substance, thinking it is a different substance, still possession or attempted possession?" Mr. Sterling argues that the district court's response, based on *State v. Fisher*, 19-01899 (La. 5/13/21), 320 So.3d 400, was misleading. He emphasizes that the *Fisher* case concerned constructive possession; whereas, the issue here, Mr. Sterling contends, is whether the State proved Mr. Sterling's knowing and intentional possession of what the 300 pills were.

Mr. Sterling's argument regarding the supplemental jury instruction confuses the district court's response to the pertinent question. Contrary to Mr. Sterling's contention, the district court's reliance on *Fisher* was regarding the jury's first question, which asked for "[c]larification of the definition of possession/attempted possession." In response to the first question, the district court, quoting *Fisher*, 19-01899, p. 4, 320 So.3d at 403, instructed:

> The Court is going to add a definition for the purpose, as the jury instructions did not have a definition for constructive possession, and will read and instruct the jury as follows: "Constructive possession exists when an offender has guilty knowledge of contraband's presence and exercises dominion and control over it. Several factors are relevant to the determination of whether a defendant exercised dominion and control sufficient to constitute constructive possession. These factors include knowledge that drugs were present, the defendant's access to the area where the drugs were found, evidence of the defendant's recent drug use, and defendant's physical proximity to the drugs. The mere presence of someone in the area where the controlled dangerous substance is found is insufficient to constitute constructive possession."

10

In response to the second question—the scenario in which a defendant thinks he possesses a different illegal substance than that actually in his possession—the district court reread the charge on general criminal intent, instructing:

> General criminal intent is present when the circumstances indicate that the defendant must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. General criminal intent is always present when there is specific intent.

> Whether criminal intent is present must be determined in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances. You may but are not required to infer that the defendant intended the natural and probable consequences of his acts.

Addressing the second question with an explanation as to what was required to prove Mr. Sterling's knowing and intentional possession of a controlled substance was not misleading.

A similar issue was addressed in *United States v. Martin*, 274 F.3d 1208 (8th Cir. 2001). There, the defendant was charged with, among other things, possession of methamphetamine with intent to distribute, a violation of Title 21 U.S.C. §841.[15] During deliberations, the jury posed the following question to the district court:

> Did [the defendant] have to know that it was specifically methamphetamine in the cooler? In other words, for a guilty verdict to be passed, does [the defendant] have to know that the material in the cooler was methamphetamine, or simply that it was drugs (controlled substances)?

*Id*. at 1209. Affirming the defendant's conviction, the Eight Circuit observed that "[t]he court properly instructed the jury that [the defendant] did not need to know the exact nature of the substance in his possession, only that it was a controlled substance of some kind. This is a correct statement of the law." *Id*. at 1210. In

---

[15] Title 21 U.S.C. §841(a) is part of the federal Comprehensive Drug Abuse Prevention and Control Act. The governing statute here—La. R.S. 40:967(A)(1)—is part of Louisiana's counterpart statutory scheme, the Uniform Controlled Dangerous Substance Law.

support, the Eight Circuit cited *United States v. Noibi*, 780 F.2d 1419, 1421 (8th Cir. 1986), for the proposition that "'[t]he 'knowingly' element of this offense refers to a general criminal intent, i.e., awareness that the substance possessed was a controlled substance of some kind.'" *Id.*

Likewise, the district court's supplemental jury instruction here was a correct statement of the law. The applicable statutory provision—La. R.S. 40:967(A)(1)—provides, in pertinent part, as follows:

> [I]t shall be unlawful for any person knowingly or intentionally . . . to produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance or controlled substance analogue classified in Schedule II.

Again, the statutory definition of the crime possession with intent to distribute has two elements: (i) a possession element; and (ii) an intent to distribute element. *See Taylor*, 16-1124, 16-1183, p. 16, 217 So.3d at 295. The possession element refers to a general criminal intent. *See State v. Clift*, 339 So.2d 755, 761 (La.1976) (observing that "Louisiana law requires only a showing of general intent, not specific intent, in order to establish that a person is guilty of possessing [a controlled dangerous substance]").[16] The intent to distribute element, by express statutory language, refers to a specific criminal intent. *See State v. Elzie*, 343 So.2d 712, 713-14 (La.1977) (observing that, in Louisiana, "we require proof of specific intent where the statutory definition of a crime includes the intent to produce or

---

[16] *See also State v. Merrill*, 12-576, p. 8 (La. App. 5 Cir. 12/27/12), 105 So.3d 264, 270 (observing that "[p]ossession of cocaine is a general intent crime"); *State v. Mingo*, 42,407, p. 4 (La. App. 2 Cir. 9/19/07); 965 So.2d 952, 955-56 (citing *State v. Clift*, 339 So.2d 755 (La.1976); *State v. Young*, 05-702 (La. App. 5 Cir.2/14/06), 938 So.2d 90; *State v. Odle*, 02-0226 (La. App. 3 Cir.11/13/02), 834 So.2d 483 (observing that "knowing and intentional possession of cocaine is a general intent crime");.*State v. Joseph*, 09-659, p. 7 (La. App. 5 Cir. 1/26/10), 32 So.3d 244, 248 (citing *State v. Sylvia*, 01-1406, p. 8 (La. 4/9/03), 845 So.2d 358, 364) (observing that "[u]nlawful possession of cocaine is a general intent crime").

accomplish some prescribed consequence (the frequent language being 'with intent to . . .'"). Here, Mr. Sterling's argument focuses on the possession element; he contends that it requires a specific intent to possess a specific controlled substance.[17]

There is no case law to support Mr. Sterling's argument that to prove a defendant knowingly or intentionally possessed a Schedule II controlled dangerous substance, violating La. R.S. 40:967(A)(1), it must be shown that the defendant knowingly or intentionally possessed a specific Schedule II controlled dangerous substance, in this case, fentanyl. Instead, the State, under La. R.S. 40:967(A)(1), was required to prove that Mr. Sterling knowingly or intentionally possessed a Schedule II controlled dangerous substance with the intent to distribute a Schedule II controlled dangerous substance. "The 'knowingly' element of this offense [(the guilty knowledge requirement)] refers to a general criminal intent, i.e., awareness that the substance possessed was a controlled substance of some kind.'" *Noibi*, 780 F.2d at 1421.

This construction of La. R.S. 40:967(A)(1) is supported by the jurisprudence. *State v. Alo*, 04-62, p. 4 (La. App. 5 Cir. 10/12/04), 886 So.2d 1130, 1132. In *Alo*, like here, the defendant claimed that he did not know the precise narcotic ingredients of the drugs in his possession; the defendant believed the drugs were "back pain pills and did not know they were actually alprazolam," a controlled dangerous substance. *Id.* Despite the defendant's claimed ignorance of

---

[17] The intent to distribute element is not at issue. "Intent to distribute illegal drugs may be established by proving circumstances surrounding the defendant's possession which give rise to reasonable inferences of intent to distribute." *State v. Ramoin*, 410 So.2d 1010, 1013 (La.1981) (*on reh'g*) (citing *State v. Elzie*, 343 So.2d 712 (La. 1977)). Mr. Sterling acknowledges that 300 fentanyl pills is not an amount consistent with personal use; in his appellant brief, he states that "[o]nly Count 7 was outside the scope of an amount consistent with personal use."

the pill's precise ingredients, the appellate court upheld the defendant's conviction based on circumstantial evidence.[18] The circumstantial evidence, the appellate court observed, reflected that while the defendant may have been ignorant of the pill's precise ingredients, one could infer that he intended to possess a controlled dangerous substance. *Alo*, 04-62, p. 5, 886 So.2d at 1132.

Here, unlike in *Alo*, the State did not rely on circumstantial evidence to establish that Mr. Sterling possessed a controlled dangerous substance. Instead, as noted elsewhere in this opinion, Mr. Sterling admitted in his written statement that he had in his possession Percocet—a Schedule II controlled dangerous substance. Moreover, Mr. Sterling was found to be in possession of 300 pills labeled Percocet, which when tested were proven to be fentanyl. Even if Mr. Sterling erroneously believed the 300 pills were Percocet (not fentanyl), the State met its burden of proof as Percocet (like fentanyl) is a Schedule II controlled dangerous substance. Mr. Sterling's sufficiency challenge as to Count 7 is unpersuasive.

As noted, Mr. Sterling's sufficiency challenge includes two sub-issues—that the State failed to lay a proper foundation for certain evidence, and that the State improperly relied on hearsay evidence. We separately address each sub-issue.

*Foundation for Certain Evidence*

Mr. Sterling contends that the State failed to prove a chain of custody necessary for the admission of the seized drugs. Mr. Sterling further contends that the State failed to lay a proper foundation for Sgt. Francis's testimony as to three topics: (i) fentanyl's chemical effects; (ii) the Crime Lab's method of weighing

---

[18] The circumstantial evidence in *Alo* consisted of evidence that the defendant went to a bar looking for his friend, Nino, in order to get pills; the defendant knew Nino had pills because he had seen Nino sell them to other people at the bar, and the defendant paid five dollars for the pills. *Alo*, 04-62, p. 5, 886 So.2d at 1132.

evidence; and (iii) the Parish Jail's procedure for taping prisoner's phone calls.[19] None of these arguments is persuasive.

As to the chain of custody of the seized drugs, the record reflects that Mr. Sterling did not object to the admissibility of the seized drugs; rather, he questioned Sgt. Francis about the chain of custody on cross-examination. In any event, Louisiana courts typically find that a defect in the chain of custody of an object may affect the weight of the evidence rather than its admissibility. *See State v. Skinner*, 15-0510, p. 9 (La. App. 4 Cir. 4/27/16), 191 So.3d 676, 682. Thus, any defect in that regard would not render the evidence inadmissible.

As to the alleged substantive defects in the chain of custody of the seized evidence drugs, Mr. Sterling contends there was a 15-day gap in the chain of custody. The seized drugs, Mr. Sterling claims, were kept in an unknown location for 15 days—from the date of his arrest (January 24, 2022) to the date the drugs were logged into evidence and submitted for testing by the Crime Lab (February 8, 2022). Mr. Sterling's claim is not supported by the record.

Sgt. Francis testified that as soon as he brought the seized drugs to the Sheriff's Office, he placed them in an evidence locker. Once the drugs were logged into the computer, bagged, and sealed, the drugs were turned over to the evidence custodian at the Sheriff's Office. Sgt. Francis explained that there is a time lapse between when evidence is secured and when it is logged into the computer. Thus, the receipt is not indicative of when the evidence was secured in the evidence

---

[19] Although Mr. Sterling additionally refers to a lack of foundation for Sgt. Francis's interpretation of slang terms, in explaining this claim he fails to specify what slang terms to which he is referring. As Mr. Sterling failed to specify in his brief the precise slang terms that Sgt. Francis allegedly defined or interpreted, this portion of his argument is not addressed in this opinion; this issue is deemed abandoned.

locker; instead, the receipt reflects "when we turn it over to the evidence custodian." Sgt. Francis confirmed that "there was no point where this [seized] evidence wasn't secured" and that there was no point when he could not attest to the location of the seized drugs. This argument lacks merit.

Mr. Sterling's next argument is that the State failed to lay a proper foundation for Sgt. Francis's testimony as to fentanyl's chemical effects. Defense counsel objected to Sgt. Francis's testimony based upon a lack of foundation, and the district court sustained the objection. The State then laid a foundation, eliciting testimony from Sgt. Francis that, as a narcotics division member, he had witnessed numerous fentanyl overdoses, had witnessed a number of fentanyl-caused deaths, and had first-hand knowledge of fentanyl's powerful effects. Thereafter, the State questioned Sgt. Francis about how he would have handled the 300 pills differently had he known they were 90% fentanyl. Once again, defense counsel objected, but this time the district court overruled the objection, explaining that the proper foundation had been laid to support Sgt. Francis' testimony regarding the Sheriff's Office's procedure for handling drugs suspected of containing fentanyl. Based on Sgt. Francis's employment, training, and experience, he was qualified to testify regarding fentanyl's chemical effect. This argument lacks merit.

As for Sgt. Francis's testimony regarding the Crime Lab's procedure for weighing evidence, defense counsel objected; and the district court sustained the objection, directing the state to "[l]ay a foundation." At that point, Sgt. Francis was asked if he was familiar with the Crime Lab's procedure for weighing drugs brought to the Crime Lab. Sgt. Francis responded that he was familiar with the Crime Lab's procedure, explaining that while he weighed all the narcotics that were seized collectively, the Crime Lab weighed "a sample from each substance."

16

Defense counsel again objected, citing an alleged lack of foundation. But, the district court overruled the objection based on Sgt. Francis' testimony that he was familiar with the Crime Lab's procedure for weighing substances submitted to it. The district court's ruling was not erroneous.[20]

Mr. Sterling next contends that the State failed to lay a proper foundation to support Sgt. Francis's testimony regarding the Jail Calls. Defense counsel objected to such testimony; the district court sustained the objection, directing the State to lay a foundation. At that point, Sgt. Francis explained that, as a Sheriff's Office member, he had access to and maintained jail calls made within the Parish Jail. He testified that he was "familiar with the process for how a defendant makes jail calls." He confirmed that whenever a telephone call is made from the Parish Jail, "a document [is] automatically created that documents when the phone call is made" and who made the call. As a Sheriff's Office member, he had access to the automatically-generated records and was a custodian of such records. Thus, Sgt. Francis was qualified to testify regarding the Jail Calls.

*Improper Hearsay Evidence*

Mr. Sterling next contends that Sgt. Francis was allowed to give improper hearsay testimony on the following topics: (i) Ms. MacAulay, Mr. Sterling's passenger, was deceased; (ii) the identity of "Brian", in a Jail Call, as Mr. Sterling's brother; (iii) the identity and reputation of "Rabbit" mentioned in a Jail

---

[20] Mr. Sterling also contends that Sgt. Francis misrepresented the quantity of narcotics he had in his possession since the sergeant's representations did not match the amounts reflected in the Crime Lab report. The discrepancy does not reflect a misrepresentation on the part of Sgt. Francis; instead, the discrepancy is attributable to the fact that Sgt. Francis weighed all the drugs that were seized; whereas, the Crime Lab weighed a sample from each substance it tested.

Call; and (iv) a Bureau of Alcohol, Tobacco, Firearms, and Explosives investigation of the purchase of the gun found in the Vehicle.

At trial, Mr. Sterling either failed to lodge any objection to Sgt. Francis's alleged hearsay testimony, or, as to the testimony that Ms. MacAulay was deceased, objected based on relevancy. Hence, any objection based on hearsay is waived on appeal. *See* La. C.Cr.P. art. 841(A) (providing that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence"); *see also State v. Keys*, 12-1177, p. 13 (La. App. 4 Cir. 9/4/13), 125 So.3d 19, 31 (citation omitted) (observing that "[t]he defense is limited on appeal to those grounds articulated at trial").

Based on the above analysis, we conclude that all of Mr. Sterling's insufficiency of the evidence arguments are unpersuasive.

**Habitual Offender Adjudication**

Mr. Sterling next contends that the district court erred in adjudicating him a fourth-felony offender and that he should have been adjudicated a second-felony offender. He identifies four deficiencies in his habitual offender adjudication. The first deficiency is that, following the First Multiple Bill Hearing, the district court vacated the original 10-year sentence on Count 2—possession of a firearm by a convicted felon—and resentenced Mr. Sterling to a 15-year term on that count. But, the State never filed a multiple bill as to Count 2. Indeed, the State was barred from using Mr. Sterling's predicate offense for the felon in possession of a firearm charge in a multiple bill proceeding. Mr. Sterling suggests that the 15-year sentence on Count 2 as a multiple offender should be vacated and the original 10-year sentence should be reinstated. The State agrees. The State concedes that the multiple bill related only to the other four convictions. This argument has merit.

Nonetheless, given we reverse the multiple offender adjudication and vacate all the sentences, we remand for the district court to resentence Mr. Sterling on Count 2.

The second deficiency Mr. Sterling identifies with his habitual offender adjudication is that the First Multiple Bill Hearing was based, in part, on Mr. Sterling's alleged 2020 conviction for simple criminal damage to property—a non-existent conviction. A review of the habitual offender bill of information submitted by the State in connection with the First Multiple Bill Hearing reflects the State averred that Mr. Sterling was previously convicted of the following three offenses:

> On or about February 11, 2021, Kevin Robert Sterling was previously convicted of Possession of Schedule II in case #27217 of Parish of Natchitoches in State of Louisiana, which crime was at the time and is presently a felony under Louisiana law; the aforesaid Kevin Robert Sterling, upon said conviction, was sentenced on February 11, 2021, and Sentence[d] to 2 years to Louisiana Department of Corrections.

> On or about May 18, 2007, Kevin Robert Sterling was previously convicted of Possession with Intent to Distribute Schedule II in DIV. A in case #C11337-2 of Parish of Natchitoches in State of Louisiana, which crime was at the time and is presently a felony under Louisiana law; the aforesaid Kevin Robert Sterling, upon said conviction, was sentenced on May 18, 2007 and Sentenced to 8 years to Louisiana Department of Corrections and 2 years without benefit of probation or parole.

> On or about September 12, 2018, Kevin Robert Sterling was previous[ly] convicted of Possession of Schedule II Controlled Dangerous Substance in DIV. I in case #540446 of Parish of Orleans in State of Louisiana, which crime was at the time and is presently a felony under Louisiana law; the aforesaid Kevin Robert Sterling, upon said conviction, was sentenced on September 12, 2018 and Sentenced to 4 years at Hard Labor Suspended and place[d] on 3 years Active Probation.

But, at the First Multiple Bill Hearing, the State submitted into evidence "Exhibit 3"—Mr. Sterling's certified conviction packet from May 2020 for felony criminal damage to property (the "2020 Non-Existent Conviction"), which the

evidence reflects was dismissed.[21] The State submitted no evidence regarding Mr. Sterling's alleged 2021 Natchitoches conviction for possession of a schedule II substance set forth in the multiple bill (the "2021 Conviction").

To obtain an habitual offender conviction, "the [S]tate must prove prior felony convictions and then prove the defendant is the same person who committed the prior felonies." *State v. Brown,* 11-1656, p. 2 (La. 2/10/12), 82 So.3d 1232, 1234 (citing *State v. Blackwell,* 377 So.2d 110 (La. 1979)). Here, the State failed with respect to the first requirement of proving prior convictions. The State presented evidence of the 2020 Non-Existent Conviction; it failed to present evidence of the 2021 Conviction. Because of the State's failure, Mr. Sterling was erroneously adjudicated a third-felony offender.

The State concedes that it mistakenly submitted evidence at the First Multiple Bill Hearing of the 2020 Non-Existent Conviction and that the district court, in adjudicating Mr. Sterling to be a third-felony offender, relied on that evidence. Nonetheless, the State emphasizes that this mistake was only made during the First Multiple Bill Hearing at which Mr. Sterling was adjudicated a third-felony offender. The State points out that all of those sentences were vacated when the State conducted a Second Multiple Bill Hearing, at which no reference was made to the 2020 Non-Existent Conviction.

A review of the Second Multiple Bill Hearing reflects that while no reference was made to the 2020 Non-Existent Conviction, the State relied on the evidence presented at the First Multiple Bill Hearing that purportedly established

---

[21] The State also submitted, as "Exhibit 2"—Mr. Sterling's certified conviction packet evidencing his 2007 conviction for possession of controlled dangerous substances with the intent to distribute.

20

Mr. Sterling's status as a third-felony offender. The State then submitted evidence of defendant's 2018 Orleans Parish possession of methamphetamines conviction; and subsequently introduced no further evidence. Instead, the State expressly requested the district court "to take judicial notice of its finding [at the First Multiple Bill Hearing] regarding [Mr. Sterling's] other two convictions." The district court subsequently did so, stating that "the Court does take judicial notice of its findings . . . adjudicating Mr. Kevin Robert Sterling as a third offender. And after today's hearing in this matter . . . finds him to be a fourth offender."

The district court, at the Second Multiple Bill Hearing, vacating all the sentences imposed at the First Multiple Bill Hearing does not solve the problem in terms of restoring Mr. Sterling's habitual offender adjudication. The district court's adjudication at the Second Multiple Bill Hearing at which it found Mr. Sterling to be a fourth-felony offender—just like the First Multiple Bill Hearing at which the district court found him to be a third-felony offender—rested on the 2020 Non-Existent Conviction. As a result, neither of Mr. Sterling's multiple offender adjudications is valid.

The State also seeks to excuse its failure to prove at the First Multiple Bill Hearing that Mr. Sterling was a third-felony offender by arguing that evidence of a felony conviction upon which the State could have relied at the hearing—the 2021 Conviction—was admitted at trial and served as the basis for the jury's finding that Mr. Sterling was a convicted felon in possession of a firearm (Count 2). But, again, it is undisputed that evidence of the 2021 Conviction was not admitted at either the First or the Second Multiple Bill Hearing. The State has the burden of proving a defendant's prior felony conviction at the habitual offender hearing. *State v. Thomas,* 16-0429, p. 10 (La. App. 4 Cir. 11/16/16), 204 So.3d 650, 656. There is

21

no law to support the proposition that a lapse in doing so can be cured by providing evidence of the prior conviction at the preceding jury trial.

The third deficiency Mr. Sterling identifies with his habitual offender adjudication is a cleansing-period problem. Pursuant to La. R.S. 15:529.1(C)(1),[22] for Mr. Sterling's May 2007 conviction to link with his other convictions, his sentence must end within 5 years of his next felony arrest. While Mr. Sterling concedes the State presented sufficient evidence to prove his May 2007 conviction for possession with the intent to distribute cocaine, resulting in the imposition of an 8-year sentence with 6 years suspended, he disputes whether the State proved the existence of intervening prior convictions from 2018 and 2021. Absent such intervening prior convictions, there is no link to allow the 2007 conviction to be used to multiple bill Mr. Sterling. Because his term of imprisonment and supervision for his 2007 conviction was 8 years, the State was required to show that Mr. Sterling's next felony arrest occurred before May 2020. Mr. Sterling's argument has merit. Absent evidence submitted at the First Multiple Bill Hearing

---

[22] La. R.S. 15:529.1(C)(1) provides:

> Except as provided in Paragraphs (2) and (3) of this Subsection, the current offense shall not be counted as, respectively, a second, third, fourth, or higher offense if more than five years have elapsed between the date of the commission of the current offense or offenses and the expiration of the correctional supervision, or term of imprisonment if the offender is not placed on supervision following imprisonment, for the previous conviction or convictions, or between the expiration of the correctional supervision, or term of imprisonment if the offender is not placed on supervision following imprisonment, for each preceding conviction or convictions alleged in the multiple offender bill and the date of the commission of the following offense or offenses. In computing the intervals of time as provided in this Paragraph, any period of parole, probation, or incarceration by a person in a penal institution, within or without the state, shall not be included in the computation of any of the five-year periods between the expiration of the correctional supervision, or term of imprisonment if the offender is not placed on supervision following imprisonment, and the next succeeding offense or offenses.

of a subsequent conviction, the State failed to show the necessary link to allow the 2007 conviction to be used to support Mr. Sterling's habitual offender status.

Although the State, at Second Multiple Bill Hearing, submitted testimony that Mr. Sterling was sentenced in September 2018, in connection with his Orleans Parish felony conviction for possession of methamphetamines, and introduced into evidence a certified conviction packet for Mr. Sterling in connection with his 2018 Orleans Parish drug conviction, that evidence does not correct the deficiency with the First Multiple Bill Hearing—that there was no evidence presented providing the necessary link to allow the 2007 conviction to be used to support Mr. Sterling's habitual offender status.

The final deficiency Mr. Sterling identifies with his habitual offender adjudication is a double jeopardy issue. According to Mr. Sterling, the Second Multiple Bill Hearing was identical to the first. He contends that the State was required to file a motion to reconsider and, in turn, an appeal or writ, and that the State was barred from filing an identical second multiple bill proceeding.

As an initial matter, the Second Multiple Bill Hearing was not identical to the first. At the First Multiple Bill Hearing, the State attempted to introduce evidence relating to two prior criminal proceedings, knowing that it was missing a witness needed to provide testimony regarding a third prior proceeding, which took place in Orleans Parish. Based on that evidence, the district court adjudicated Mr. Sterling a third-felony offender. At the First Multiple Bill Hearing, the State acknowledged its intent to file a second habitual offender bill in order to introduce evidence of the Orleans Parish 2018 possession of narcotics conviction to further enhance Mr. Sterling's sentence.

Mr. Sterling contends that the collateral estoppel doctrine prohibited the State from re-litigating his habitual offender status again between the same parties.[23] But, the same issues were not re-litigated in the First and the Second Multiple Bill Hearings. As noted above, the State, at the First Multiple Bill Hearing, introduced evidence of two of Mr. Sterling's prior criminal proceedings; the State, at the Second Multiple Bill Hearing, introduced evidence of a third prior conviction was submitted. Mr. Sterling suggests that the second multiple offender adjudication violated the prohibition against double jeopardy and that the collateral estoppel doctrine is anchored in the Fifth Amendment guarantee against double jeopardy. But, it is well-settled that double jeopardy does not apply to multiple offender proceedings. *See State v. Langendorfer,* 389 So.2d 1271, 1277 (La. 1980) (observing that "[a] second multiple offender hearing does not involve double jeopardy.").[24]

When an appellate court is faced with an habitual offender adjudication based on insufficient evidence, the proper remedy is to reverse the habitual offender adjudication, vacate the sentence, and remand to the trial court for further proceedings. *State v. Robair,* 10-1434, p. 1 (La. App. 4 Cir. 8/24/11), 72 So.3d 460, 461. That is this situation here. Accordingly, we reverse the habitual offender adjudication, vacate the sentences, and remand to the district court for further proceedings.

---

[23] Collateral estoppel means "'that when an issue of ultimate fact has once been determined by a vailid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *State v. Blache*, 480 So.2d 304, 306 (La. 1985) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)).

[24] *See also State v. Davis,* 02-0565, p. 16 (La. App. 4 Cir. 12/11/02), 834 So.2d 1170, 1180 (quoting *Langendorfer, supra*) ("[I]t is well-settled that double jeopardy does not apply to a multiple offender proceeding because '[s]uch a proceeding is merely a part of sentencing.'"); *State v. Picot,* 98-2194, p. 1 (La. App. 4 Cir. 11/20/98), 724 So.2d 236, 237 (same).

**Excessive Sentence**

Given that the State presented insufficient evidence to support Mr. Sterling's habitual offender adjudication, that all of his sentences must be vacated, and that we are remanding the matter for resentencing on all counts, we do not reach the issue of whether Mr. Sterling's sentences are excessive. The issue is moot.

**Warrantless Search**

Mr. Sterling's *pro se* assigned error is that the Vehicle was stopped illegally and then unlawfully searched without a warrant. He contends that the evidence recovered from such warrantless search should have been excluded from use in any resulting prosecution. *See State v. Harris,* 00-1930, p. 3 (La. App. 5 Cir. 4/11/01), 786 So.2d 798, 801-02 (observing that "evidence recovered as a result of an unconstitutional search and seizure may not be used in a resulting prosecution against the citizen").

The record reflects that Mr. Sterling filed a pre-trial motion to suppress and that the warrantless search issue was the subject of that motion. At the motion hearing, Sgt. Francis testified that he and Sgt. Lambert stopped the Vehicle because it had an obliterated, undecipherable license plate. When the Officers approached the Vehicle, Sgt. Francis immediately smelled a strong marijuana odor emanating from it. Contemporaneously, Sgt. Lambert, upon approaching the passenger side of the Vehicle, saw from the outside of the Vehicle, drug paraphernalia in plain view. Based on these facts, the Officers searched the Vehicle. Pursuant to their search, Sgt. Lambert found a firearm in the glove compartment and, on the back seat, they found extra gun magazines and a Bag. In the unlocked compartment of the Bag they found a plastic bag containing crystal meth. Inside the locked compartment of the Bag, they found additional crystal

meth, marijuana, and 300 pills, which later tested positive for fentanyl. Following Sgt. Francis's testimony, the district court ruled, finding no reason to suppress the evidence seized in connection with the Officers' investigation. We agree.

A traffic stop is justified if an officer has an objectively reasonable suspicion that some sort of legal violation—such as a traffic violation—occurred or is about to occur before stopping the vehicle. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Here, Sgt. Francis testified that Mr. Sterling's license plate was obliterated. This traffic violation justified the initial stop. Thereafter, a marijuana odor was detected and drug paraphernalia was seen in plain view. At that point, the Officers had probable cause to search the Vehicle under the automobile exception to the warrant requirement.

This Court has explained that exception as follows:

> Although a warrant is generally required prior to conducting a search, *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the "automobile exception" to this requirement is well-established. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Pursuant to the "automobile exception," there is no separate exigency requirement if there is probable cause to search a vehicle. *U.S. v. Ross*, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *see Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.")

*State v. Anderson*, 06-1031, p. 5 (La. App. 4 Cir. 1/17/07), 949 So.2d 544, 547-48. Further, police officers who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it may conduct a warrantless search of the vehicle that is as thorough as a magistrate could authorize by warrant, including a probing search of compartments and containers within the vehicle whose contents are not in plain view. *United States v. Ross*, 456 U.S. 798, 800, 102 S.Ct. 2157, 2160, 72 L.Ed.2d 572 (1982).

26

Because "[a] warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search," the same is true of a warrantless search supported by probable cause. *Ross,* 456 U.S. at 821, 102 S.Ct. at 2171. "The scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object (in this case, narcotics) of the search and the places in which there is probable cause to believe that it may be found." *Id.* at 824; *see also California v. Acevedo,* 500 U.S. 565, 570, 111 S.Ct. 1982, 1986, 114 L.Ed.2d 619 (1991) (police do not need warrant to search closed container found within a lawfully stopped vehicle when the officers have probable cause for the search).

The Officers had probable cause to search the Vehicle once Sgt. Francis smelled the odor of marijuana and Sgt. Lambert saw in plain view drug paraphernalia. The valid, warrantless search justifiably included a search of the Bag's locked compartment and the glove compartment. Given that narcotics could have been contained in the Bag's locked compartment and in the glove compartment, these areas were properly included in the Officers' authorized search. Accordingly, Mr. Sterling's *pro se* claim that he was stopped illegally and then the Vehicle was searched illegally is not persuasive.

## DECREE

For the foregoing reasons, we affirm Mr. Sterling's convictions, reverse his habitual offender adjudication, vacate his sentences, and remand to the district court for further proceedings.

**CONVICTIONS AFFIRMED; HABITUAL OFFENDER ADJUDICATION REVERSED; SENTENCES VACATED; AND REMANDED**